IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RAMON BADILLO-SANTIAGO, et. al. \*
\*
Plaintiffs                                    \*
\*         Civil No. 98-1993(SEC)
v.                                            \*
\*
HON. JOSE ANDREU-GARCIA, et. al. \*
\*
Defendants                                    \*
\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



**OPINION AND ORDER**

Pending before the Court is the Commonwealth of Puerto Rico's "Motion to Dismiss," **(Docket # 179)**, and a similar motion filed by co-defendants José Andreu-García and Mercedes M. Bauermeister. **(Docket # 164)**. For the reasons stated below, the two referenced motions are **GRANTED**.

**I. Background**

This case was filed on August 31, 1998 by Dr. Ramón Badillo-Santiago, *pro se*, against various officials of the Commonwealth of Puerto Rico and the Commonwealth itself.[1] Plaintiff claimed redress pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C.

---

[1] Those included in the original complaint were: the Hon. José Andreu García, Chief Justice of the Supreme Court of Puerto Rico, in his official capacity as Administrator of the Judicial System; Mercedes M. Bauermeister, in her official capacity as Director of the Puerto Rico Office of Courts Administration; Wilfredo Girau Toledo, in his official capacity as Director of the Puerto Rico Public Buildings Authority; the Commonwealth of Puerto Rico, represented by Hon. José Fuentes Agostini, Secretary of the Puerto Rico Department of Justice, included in his official capacity; and Superior Court Judge Julio Berríos Jiménez, in his official and personal capacity. (Docket # 1).

**Civil No. 98-1993(SEC)**                                                                                                   2

§ 12101, et. seq., and the constitutional protections of due process and the equal protection of the laws under 42 U.S.C. § 1983, for the alleged failure of the defendants to provide him with a reasonable accommodation during a Court hearing because he is hearing impaired. (Docket #1, p. 3).

On September 30, 1999 this Court issued an Opinion and Order ruling on various motions to dismiss filed by the defendants whereby Plaintiff's claims against the judge presiding over the court proceedings in the Commonwealth Court of First Instance were dismissed on grounds of judicial immunity. Additionally, Plaintiff's claims for civil rights violations, brought pursuant to 42 U.S.C. § 1983 were also dismissed. (See Docket # 74). Finally, Plaintiff's complaint against the former Secretary of Justice, José Fuentes Agostini, was dismissed both in his personal and official capacity. (Dkts. # 99, 100). Only Plaintiff's claims against the Commonwealth of Puerto Rico, brought pursuant to the ADA remained.[2] (See Dkts. # 73-4, 121). Co-defendant Hon. José Andreu-García remained a part of this action in his official capacity as Chief Justice of the Supreme Court of Puerto Rico and Administrator of the Judicial System. Ms. Mercedes M. Bauermeister and Wilfredo Girau-Toledo, also remained a part of the action, in their official capacities as directors of the Puerto Rico Office of Courts Administration and the Puerto Rico Public Buildings Authority, respectively.

---

[2] On May 16, 2000 the Court denied Plaintiff's motion for reconsideration and request for leave to amend the complaint. (Dkt. # 121).

**Civil No. 98-1993(SEC)** 3

On March 26, 2001 co-defendants José Andreu-García and Mercedes M. Bauermeister, filed a motion to dismiss Plaintiff's complaint, on grounds that the case of Board of Tr. of the Univ. of Alabama v. Garrett, 121 S.Ct. 955 (2001), bars Plaintiff's cause of action in federal court. In the alternative, they argued that principles of comity warrant dismissal of this case because the Commonwealth Court of Appeals has remanded Plaintiff's case to the Commonwealth Court of First Instance for a new trial with the availability of a reasonable accommodation. (Dkt. # 164). They also joined a motion to dismiss filed by the Commonwealth of Puerto Rico.

The Commonwealth's motion, (Dkt. # 179), also relying on the Garrett case, argued that the Court should dismiss Plaintiff's cause of action under Title II of the ADA because the statute's expressed intent to abrogate the States' sovereign immunity is insufficient to bypass the protection afforded to the States by the Eleventh Amendment to the U.S. Constitution, pursuant to the Supreme Court's recent case law interpreting the Eleventh Amendment. (Dkt. # 171 at 2).

Plaintiff's Opposition, argued that the U.S. Congress effectively abrogated the Commonwealth's Eleventh Amendment immunity from suit in federal courts as required by the Supreme Court in Garret, supra, because "Title II was a valid exercise of Congress's authority under § 5 of the Fourteenth Amendment." (Dkt. # 182).

Civil No. 98-1993(SEC)                                                                                                  4

In compliance with Fed.R.Civ.P. 24(c) and 28 U.S.C. § 2403, on May 14, 2001 the Clerk of the Court certified this question of constitutional law to the Department of Justice for its intervention, (Dkt. # 172), but they declined to intervene. (Dkt. # 181).

Having received all the parties' expected submissions on this issue, the Court now holds as follow.

## II. Analysis of Applicable Law

The Eleventh Amendment to the U.S. Constitution provides that:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State.

U.S. Const. Amend. XI. Although the Eleventh Amendment literally seems to apply only to suits against a State by citizens of another State, the Supreme Court has consistently extended the scope of the amendment to suits by citizens against their own State. See Garrett, 121 S. Ct. at 962; see also Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 72-73 (2000) ; Hans v. Louisiana, 134 U.S. 1, 15 (1890). In that sense, the Supreme Court has established that the Eleventh Amendment stands "not so much for what it says, but for the presupposition which it confirms." Kimel, 528 U.S. at 72-73. This presupposition is composed of two separate premises: first, that each State is a sovereign entity in our federal system; and second, that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996).

Civil No. 98-1993(SEC)                                                                                             5

It is clear though that the Constitution does not provide for federal jurisdiction over suits against nonconsenting states. See Kimel, 528 U.S. at 73. In addition, there is no doubt that the Commonwealth of Puerto Rico enjoys the full protection of the Eleventh Amendment. See Jusino-Mercado v. Commonwealth of Puerto Rico, 214 F.3d 34, 37 (1st Cir. 2000); see also Ortiz-Feliciano v. Toledo-Dávila, 175 F.3d 37, 39 (1st Cir. 1999).

There are few recognized exceptions to the Eleventh Amendment's immunity but none is applicable here. One of them is that a State may expressly waive its immunity and consent to be sued in federal court. See Atascadero State Hospital v. Scanlon, 473 U.S. 234, 238 (1985). The other recognized exception is that Congress may abrogate the sovereign immunity of the States when "it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" Garrett, 121 S. Ct. at 962.[3] However, thus far, the Supreme Court has only found a "valid grant of constitutional authority" to abrogate the States' immunity in Section 5 of the Fourteenth Amendment. See Garrett, 121 S. Ct. at 963; Seminole Tribe, 517 U.S. at 59-66.

---

[3] A third exception follows from the Supreme Court case of Ex parte Young, 209 U.S. 123 (1908), which allowed federal court jurisdiction over suits against state officials in their official capacity only for prospective injunctive relief. Currently, Plaintiff's complaint, as amended, seeks declaratory and injunctive relief, in addition to compensatory and punitive damages. (Dkt. # 132 at pp. 10-11). Since the parties did not discuss the applicability of Ex parte Young, supra, to this case, the Court will not enter to consider it in this Opinion.

AO 72A
(Rev.8/82)

It is clear that Congress stated its unequivocal intent to abrogate the States' sovereign immunity when it enacted the ADA. See 42 U.S.C. § 12202; Garrett, 121 S. Ct. at 962. For purposes of this case, it is unnecessary to dwell on this issue any further.

However, with respect to the second prong of the test, a series of judicial decisions by the Supreme Court have firmly established that Congress may not abrogate the States' immunity when acting through its powers enumerated in Article I of the Constitution. See Id.; see also Kimel, 528 U.S. at 78. In the Supreme Court's own words, "Congress' powers under Article I of the Constitution do not include the power to subject States to suit at the hands of private individuals." Kimel, 528 U.S. at 80; Seminole Tribe, 517 U.S. at 66-67; Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank, 527 U.S. 627, 737 (1999).

Of course, as stated above, Congress may abrogate the States' immunity if it does so pursuant to a valid exercise of its § 5 of the Fourteenth Amendment's powers.[4] See Garrett, 121 S.Ct. at 962. However, Congress may not circumvent this limitation on its powers simply by stating that it is acting pursuant to Section 5 when enacting a statute. Instead, the courts must independently evaluate whether the statute in question was a valid exercise of

---

[4] Section 1 of the Fourteenth Amendment provides, in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Section 5 of the Fourteenth Amendment grants Congress the power to enforce the substantive guarantees contained in § 1 by enacting "appropriate legislation."

**Civil No. 98-1993(SEC)**                                                                                              7

Congress' power under Section 5, as opposed to an exercise of another power. See Garrett, 121 S.Ct. at 964; see also Kimel, 528 U.S. 78-80. For example, in Garrett the Supreme Court held that the ADA's legislative record failed to establish a pattern in fact of "irrational state discrimination" in employment against the disabled that would justify acting under Section 5, and thus sustain Congress' abrogation of the States' Eleventh Amendment immunity. Garrett, 121 S.Ct. at 964-965. The Court determined that for Congress to authorize private individuals to sue the States in federal courts to recover money damages, "there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation." Id. at 967-968.

The case at hand presents an issue that was explicitly left unanswered by the Supreme Court in Garrett: whether Title II of the ADA constitutes appropriate legislation under § 5 of the Fourteenth Amendment. See Garrett, 121 S. Ct. at 960 n.1. For a number of different reasons, the Court finds that it does not.

In Garrett, the Supreme Court acknowledged Congress' duty to determine and remedy violations of the rights guaranteed by the Fourteenth Amendment. Garrett, 121 S.Ct. at 963 ("Congress is not limited to mere legislative repetition of this Court's constitutional jurisprudence. Rather, Congress' power to enforce the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the

**Civil No. 98-1993(SEC)**                                                                                           8

Amendment's text."). However, the courts and not Congress, have the responsibility of defining the substance of constitutional guarantees. Id.; see also Kimel, 528 U.S. at 80-81. In order for Congress' abrogation of the States' Eleventh Amendment immunity to be effective, Congress must identify a pattern of discrimination by the States and draft legislation that is both congruent and proportional "between the injury to be prevented or remedied and the means adopted to that end." Garrett, 121 S.Ct. at 963; City of Boerne v. Flores, 521 U.S. 507, 536 (1997). In Garrett, supra, the Supreme Court found that Title I of the ADA was not such a legislation because (1) Congress failed to identify and establish a pattern of discrimination against the disabled in employment, 121 S.Ct. at 965; and (2) even if it were possible to conclude that a pattern of discrimination existed based on a sparse legislative record, the ADA would present problems of congruence and proportionality because the accommodation duty required by Title I "far exceeds what is constitutionally required" of the States in this area. Id. at 966-67.

The Supreme Court in Garrett, followed Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 446 (1985), where it had already established that a "rational basis" review is used for Equal Protection cases where the disabled are concerned. Garrett, 121 S.Ct. at 963. Thus the Supreme Court concluded that States are not constitutionally required to make special accommodations for the disabled, so long as their actions toward these individuals are rational. Id. at 964.

**Civil No. 98-1993(SEC)** 9

In the aftermath of Garrett, supra, several courts have already confronted the issue of Congress' abrogation of the States' Eleventh Amendment immunity for purposes of Title II of the ADA. Title II of the ADA refers to public accommodations and provides that: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132. A "public entity" means a state or local government, the departments, agencies, special purpose districts, and other instrumentalities of state and local governments. 42 U.S.C.A. §§ 12131(1).

In Thompson v. Colorado, 258 F.3d 1141 (10th Cir. 2001), an opinion issued by the Tenth Circuit Court of Appeals in the aftermath of Garrett,[5] the court was faced with precisely the same legal issue now before this Court. The Tenth Circuit carried out the analysis established by the Supreme Court in Garrett, supra, to find that:

> . . . Title II cannot be considered preventive or remedial legislation that is congruent and proportional to any constitutional violation. Without numerous documented occurrences of unconstitutional state discrimination against the disabled, Title II's accommodation requirement appears to be an attempt to prescribe a new federal standard for the treatment of the disabled rather than an attempt to combat unconstitutional discrimination. In this respect, Title II resembles RFRA, which the Supreme Court struck down in Flores. See 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624; see also Erickson, 207 F.3d at 951

---

[5] Although many courts have addressed this issue prior to Garrett, supra, with varying results, (See Commonwealth of Puerto Rico's Br., Dkt. 179 at pp. 03.9-11), the Court will limit its analysis to post-Garrett cases, since they are the most relevant and address the current state of the law.

("What the RFRA did for religion, the ADA does for disabilities."). Thus, Title II is not a valid abrogation of the states' Eleventh Amendment immunity.

Thompson v. Colorado, 258 F.3d at 1255. The court there noted that while "in certain limited circumstances such as those involving voting rights and prison conditions, states are required to make at least some accommodations for the disabled . . ." that is not the case in the vast majority of cases. Id. at 1253. The legislative record, the court noted, provided "some evidence . . . that unconstitutional discrimination against the disabled exists in government 'services, programs, or activities.'" Id. at 1254 (citations omitted). However, "the vast majority of incidents discussed in the legislative record involving 'government services, programs or activities' are refusals by public entities to make accommodations for the disabled." Id. The court found determinative the fact that there was an absence of numerous examples of unconstitutional discrimination, thus confirming that "Title II's primary focus was the failure by public entities to make accommodations by the disabled." Id. This kind of behavior is not prohibited by the Supreme Court case law interpreting the Fourteenth Amendment. In particular, the Supreme Court has stated that:

> [d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference--of benign neglect . . . . Federal agencies and commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus.

Civil No. 98-1993(SEC)                                                                                              11

Alexander v. Choate, 469 U.S. 287, 295-96, (1985) (quoted in Thompson v. Colorado, 258 F.3d at 1255). As noted by the Tenth Circuit "[a]pathetic attitudes and refusals to make accommodations do not usually violate the Fourteenth Amendment." Thompson v. Colorado, 258 F.3d at 1255. Thus, the Tenth Circuit found that it could not conclude that Congress had "identified a history and a pattern of unconstitutional discrimination by the states against the disabled." Id.

In Lieberman v. State of Delaware, No. Civ. A. 96-523 GMS, 2001 WL 1000936 (D. Del. Aug. 30, 2001), the Delaware District Court also confronted this issue and found that: "Title II cannot be seen as enforcing direct violations of the Fourteenth Amendment, but rather, Title II attempts to deter and remedy constitutional violations within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." Id., 2001 WL 1000936 at *3 (internal quotation marks omitted). In Lieberman the controlling point was "the limited protections afforded the disabled under the rational basis standard of the Fourteenth Amendment clause[,]" which foreclosed Congress' "attempts to impose greater obligations and responsibilities on the States' through Title II of the ADA." 2001 WL 1000936 at *2. The court concluded that Title II of the ADA was not carefully tailored to remedy a pattern of unconstitutional conduct against the disabled by the States. Id. at *3 (citing Frederick L. v. Department of Public Welfare, Civ. A. No. 00-4510, 2001 WL 830480 (E.D.Pa. July 23, 2001), Doe v. Division of Youth and Family Servs., 148

Civil No. 98-1993(SEC)                                                                                    12

F.Supp.2d 462 (D.N.J. 2001), and <u>Moyer v. Conti</u>, Civ. No. 99-744, 2000 WL 1478791, (E.D.Pa. Oct.5, 2000)).

In <u>Neiberger v. Hawkins</u>, 150 F.Supp.2d 1118 (D. Col. 2001), the district court granted a motion to dismiss plaintiff's complaint under Title II of the ADA on grounds that: (1) "there [wa]s no evidence that Congress recognized a pattern of unconstitutional discrimination against disabled citizens in obtaining services, programs, or activities of a public entity;" and (2) "[e]ven assuming, however, that [the legislative record] exhibits a pattern of unconstitutional discrimination, Title II would still fail under the congruence and proportionality requirements stated in <u>City of Boerne v. Flores</u>, 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)." <u>Neiberger v. Hawkins</u>, 150 F.Supp.2d at 1124. The court there noted that:

> Title II of the ADA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. . . . Like the ADEA and Title I of the ADA, Title II of the ADA prohibits a broad swath of conduct without permitting any inquiry into the State's legitimate interests. Indeed, Title II's prohibition of "discrimination" is even more stringent than the provisions ruled violative in <u>Kimel</u>, given that the ADEA incorporates statutory exceptions that Title II of the ADA does not. . . . Under the statute, State practices affecting the disabled do not receive the same presumption of legitimacy that they do under rational basis scrutiny. . . . [U]nder the ADA it is no longer the case that any rational reason will support the State's action. . . . Moreover, while the Fourteenth Amendment allows the State to make broad generalizations about the disabled, the ADA starts with a presumption in favor of requiring the [State] to make an individualized determination. . . .

<u>Id.</u> at 1124-5 (internal citations and quotation marks omitted).

In <u>Doe v. Div. of Youth and Family Serv.</u>, 148 F.Supp.2d 462 (D.N.J. 2001), the district court carried out the constitutional analysis explained above, only to conclude that: "there is no indication in the Congressional record that Congress identified a pattern of irrational discrimination against the disabled in the policies and practices of state child welfare agencies directed toward HIV-positive mothers." <u>Id.</u> at 487-8. "Additionally, the duty of accommodation imposed on the States under Title II far exceeds what is constitutionally mandated. While Congress has 'wide latitude' in determining what remedial measures are needed to cure societal problems, when abrogating state sovereign immunity the remedial requirements imposed on States must be congruent and proportional to the identified injury in relation to that which is constitutionally mandated." <u>Id.</u> at 488. In that case, the Court concluded that "Title II and the regulations enacted thereunder require far more of the States than that which is constitutionally mandated." <u>Id.</u> at 489.

Plaintiff's opposition to the Defendants' motions to dismiss argues that "Title II was a valid exercise of Congress' authority under § 5 of the Fourteenth Amendment[.] [because] Congress identified a specific pattern of unconstitutional State discrimination and enacted a remedy congruent and proportional to that harm." (Dkt. # 182 at p. 1). Plaintiff supports his motion with extensive reference to the historical legislative record of the ADA. However, Plaintiff's referenced legislative history relates mainly to public accommodations for children in public schools, and other specific areas such as voting rights, family-related

**Civil No. 98-1993(SEC)**                                                                 14

rights, and jury service. (Id. at p. 7). Plaintiff does not make reference to any legislative history regarding States' discrimination against the hearing impaired and the courts' system in particular. (Id.). In addition, Plaintiff's reference to the record does not persuade the Court to depart from the cases referenced above. The determining factor in the Court's opinion is the rational review standard, and nothing in the record cited by the Plaintiff provides evidence of an irrational discrimination against the hearing impaired.

In this particular area, the case of <u>Popovich v. Cuyahoga County Court of Common Pleas</u>, 227 F.3d 627 (6th Cir. 2000), is significantly relevant because of its striking similarity to the facts involved. In that case, the plaintiff claimed that a state court violated his rights under the ADA for not providing him with a hearing aid to accommodate his hearing disability throughout the judicial proceedings. See <u>Popovich</u>, 227 F.3d at 630. In <u>Popovich</u>, the Sixth Circuit Court of Appeals applied the "congruence and proportionality test" established by the Supreme Court in <u>City of Boerne</u>, <u>supra</u>, and used in <u>Kimel</u>, <u>supra</u>, to conclude that Congress indeed exceeded its constitutional powers to abrogate States' Eleventh Amendment immunity. See <u>Popovich</u>, 227 F.3d at 634-636. The Court of Appeals noted that even when the statutes involved in <u>Kimel</u> and <u>City of Boerne</u> were distinguishable in several aspects from the ADA, those distinctions were not sufficient to require a different outcome. See <u>Popovich</u>, 227 F.3d at 637.

In particular, the Court of Appeals noted that disabled persons are not a suspect class for purposes of equal protection analysis. See <u>Popovich</u>, 227 F.3d at 637. As such, Congress'

**Civil No. 98-1993(SEC)**                                                                                                      15

statement in the ADA that the disabled are a "discrete and insular minority" is contrary to the judicial precedent in Cleburne, supra, and also indicates that Congress had the intention of effecting a substantive alteration of that precedent. See Id. For purposes of the Equal Protection analysis, Title II is not a proportional remedial or preventive measure that could actually prevent an unconstitutional behavior on the part of the States. Id.

When the Sixth Circuit Court of Appeals compared Title II of the ADA to similar statutes such as the ADEA, whose abrogation provision was already invalidated by the Supreme Court in Kimel, it found that Title II's prohibitions are more stringent considering the fact that the ADA did not even incorporate statutory exceptions to the States' actions in light of their legitimate interests. Id. The Court found that the only exceptions to the States' duty to accommodate disabled individuals appear in the enforcing agency's regulations. Id. It further concluded that the Attorney General's regulations do not save Title II of the ADA from invalid abrogation of immunity in light of the Equal Protection Clause. Popovich, 227 F.3d at 639. Title II makes no attempts to distinguish between any neutral policies that violate the Equal Protection Clause and those policies that do not. It does provide the disabled more relief than would otherwise be available under the Fourteenth Amendment. Id.

In Popovich, the Court of Appeals reviewed the legislative history of the ADA which suggests that: (1) there is no evidence that the States engaged in a widespread pattern of unconstitutional discrimination against the disabled; and (2) the real purpose for enacting the

Civil No. 98-1993(SEC)                                                                                          16

ADA was Congress' desire to achieve consistency between federally-funded programs covered by the Rehabilitation Act of 1973 and other government programs. See Id., at 640-641. These suggestions do not serve to extend Congress' remedial authority under Section 5 of the Fourteenth Amendment. This finding is significant because the Supreme Court later confirmed in Garrett Congress' failure to identify a pattern of state discrimination against the disabled when enacting the ADA.

### III. Conclusion

For the foregoing reasons, Defendant's motion to dismiss is **GRANTED**. Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico, this 27 day of September, 2001.

SALVADOR E. CASELLAS
United States District Judge